# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Nos. 20-2754, 20-2755

**County of Ocean, et al.**,
*Plaintiffs-Appellants*,

v.

**Gurbir S. Grewal, et al.**,
*Defendants-Appellees*,

and

**Robert A. Nolan, et al.**,
*Plaintiffs-Appellants*,

v.

**Gurbir S. Grewal, et al.**,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of New Jersey, No. 3:19-CV-18083-FLW-TJB
(Hon. Freda L. Wolfson, U.S.C.D.J.)

**Brief for Defendants-Appellees, Gurbir S. Grewal and the New Jersey Office of the Attorney General, Department of Law and Public Safety, Division of Criminal Justice**

GURBIR S. GREWAL
  *Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
  *State Solicitor*

DANIEL M. VANNELLA
  *Assistant Attorney General*

BRYAN EDWARD LUCAS
MICHAEL R. SARNO
MARIE SOUEID
EMILY K. WANGER
  *Deputy Attorneys General*

R.J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625-0080
Phone: 609-376-2776
daniel.vannella@law.njoag.gov

*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

COUNTERSTATEMENT OF JURISDICTION ....................................4

COUNTERSTATEMENT OF ISSUES ..................................................4

STATEMENT OF RELATED CASES AND PROCEEDINGS.............4

COUNTERSTATEMENT OF THE CASE...........................................5

    A. Federal Immigration Law........................................................5

    B. The Immigrant Trust Directive .................................................7

    C. The Underlying Lawsuits and Decision Below ...........................12

SUMMARY OF ARGUMENT .........................................................14

COUNTERSTATEMENT OF THE STANDARD OF REVIEW .........17

ARGUMENT.....................................................................................18

    I.      APPELLANTS CANNOT SUE THEIR STATE IN FEDERAL COURT ON FEDERAL CONSTITUTIONAL GROUNDS .............18

    II.    FEDERAL LAW DOES NOT PREEMPT THE IMMIGRANT TRUST DIRECTIVE....................................................................23

           A.    The INA Does Not Expressly Preempt The Immigrant Trust Directive .................................................................24

           B.    The INA Does Not Otherwise Preempt The Immigrant Trust Directive .................................................................30

C.    The Canon of Constitutional Avoidance Bolsters The Conclusion That The INA Does Not Preempt The Directive ...................................................................37

D.    Cape May County's Remaining Challenge Is Waived.............46

CONCLUSION ...................................................................50

CERTIFICATION OF BAR MEMBERSHIP ......................................51

CERTIFICATE OF COMPLIANCE...................................................52

CERTIFICATE OF SERVICE...........................................................53

# TABLE OF AUTHORITIES

**Page(s)**

*Amato v. Wilentz,*
    952 F.2d 742 (3d Cir. 1991) ................................................................ 20, 21

*Arizona v. United States,*
    567 U.S. 387 (2012) ............................................................................ *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ................................................................................ 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................ 17

*Bell Atl.-Pa. v. Pa. Pub. Util. Comm'n,*
    273 F.3d 337 (3d Cir. 2001) .................................................................... 47

*Bond v. United States,*
    572 U.S. 844 (2014) ................................................................................ 37

*Branson Sch. Dist. RE-82 v. Romer,*
    161 F.3d 619 (10th Cir. 1998) ............................................................ 21, 22

*Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank,*
    136 F.3d 1360 (9th Cir. 1998) ................................................................ 18

*Byrd v. Shannon,*
    715 F.3d 117 (3d Cir. 2013) .................................................................... 28

*Caisson Corp. v. Ingersoll-Rand Co.,*
    622 F.2d 672 (3d Cir. 1980) .................................................................... 47

*Chicago v. Barr,*
    961 F.3d 882 (7th Cir. 2020) ................................................................ 33, 42

*Chicago v. Sessions,*
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ...................................................... 44

*Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018), *vacated in part on other grounds,*
    2018 WL 4268817 (7th Cir. June 4, 2018) ............................................ 32

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999)................................................................45

*City of San Juan Capistrano v. Cal. PUC*,
937 F.3d 1278 (9th Cir. 2019)..................................................18, 20

*Coleman v. Miller*,
307 U.S. 433 (1939)......................................................................19, 20

*Colorado v. Dep't of Justice*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ..................................43, 45

*Continental Cas. Co. v. Dominick D'Andrea*,
150 F.3d 245 (3d Cir. 1998).............................................................47

*De Canas v. Bica*,
424 U.S. 351 (1976)..............................................................................6

*El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018).........................................................36

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014)...................................................35, 39

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960)......................................................................22, 23

*Guerrero-Sanchez v. Warden York Cty. Prison*,
905 F.3d 208 (3d Cir. 2018).........................................................37

*HIAS v. Trump*,
No. 20-1160, 2021 WL 69994 (4th Cir. Jan. 8, 2021) .............18, 41

*Hunter v. Pittsburgh*,
207 U.S. 161 (1907).............................................................................19

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009).............................................................47

*Kansas v. Garcia*,
140 S. Ct. 791 (2020)....................................................................6, 36

*Lamar, Archer & Cofrin, LLP v. Appling*,
138 S. Ct. 1752 (2018) ...................................................................26

*Laurel Gardens, LLC v. McKenna*,
948 F.3d 105 (3d Cir. 2020) ..........................................................47

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ...........................................................*passim*

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)........................................................................26

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)........................................................................38

Petn. For Certirioari, *New York v. Dep't of Justice*,
No. 20-795 (U.S.) ...........................................................................46

*New York v. United States*,
505 U.S. 144 (1992)..................................................................38, 39

*Newark v. New Jersey*,
262 U.S. 192 (1923)........................................................................19

*Nixon v. Mo. Mun. League*,
541 U.S. 125 (2004)........................................................... 17, 41, 45

*Nolan v. Grewal*,
A-4614-19 (N.J. App. Div.) ............................................................14

*O'Shea v. Twp. of W. Milford*,
982 A.2d 459 (N.J. Sup. Ct. App. Div. 2009)...................................8

*Ocean v. New Jersey*,
A-1341-20 (N.J. App. Div.) ............................................................14

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019)...........................................43, 44

*Paff v. Ocean Cty. Prosecutor's Office*,
    192 A.3d 975 (N.J. 2018)...............................................................8

*Parker v. Brown*,
    317 U.S. 341 (1943)...................................................................33

*Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018), *vacated in part on other*
    *grounds*, 916 F.3d 276 (3d Cir. 2019) ...................................25, 26

*Philips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)......................................................17

*Planned Parenthood of Kan. & Mid-Mo. v. Moser*,
    747 F.3d 814 (10th Cir. 2014)....................................................22

*Printz v. United States*,
    521 U.S. 898 (1997)........................................................38, 39, 43

*R.R. Comm'n v. L.A. Ry. Corp.*,
    280 U.S. 145 (1929)...................................................................19

*Rogers v. Brockette*,
    588 F.2d 1057 (5th Cir. 1979)...................................................21

*Roth v. Norfalco LLC*,
    651 F.3d 367 (3d Cir. 2011)......................................................36

*San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020).....................................................30

*San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018)........................................43

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010)......................................................17

*St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I.*,
    218 F.3d 232 (3d Cir. 2000)......................................................24

*State of New York v. Dep't of Justice*,
    951 F.3d 84 (2d Cir. 2020).................................................45, 46

*Steinle v. San Francisco*,
919 F.3d 1154 (9th Cir. 2019) .................................................25, 27

*Trenton v. New Jersey*,
262 U.S. 182 (1923) ................................................ 18, 19, 20, 21

*Tweed-New Haven Airport Auth. v. Tong*,
930 F.3d 65 (2d Cir. 2019) .............................................21

*United States v. California*,
921 F.3d 865 (9th Cir. 2019), *cert. denied*, No. 19-532 (U.S. June
15, 2020) ................................................................*passim*

*United States v. New Jersey*,
No. 20-1364, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ................................5, 48

*Webb v. Philadelphia*,
562 F.3d 256 (3d Cir. 2009) ...........................................47

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ....................................................28

*Williams v. Baltimore*,
289 U.S. 36 (1933) ................................................ 19, 20, 21

*Wis. Pub. Intervenor v. Mortier*,
501 U.S. 597 (1991) ...................................................18

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ................................................ 19, 20, 21, 22

**Statutes**

8 U.S.C. § 1151(a) .........................................................6

8 U.S.C. § 1182 ...........................................................26

8 U.S.C. § 1226 ...........................................................6

8 U.S.C. § 1227(a)(2) .................................................6, 34

8 U.S.C. § 1231 ...........................................................6

8 U.S.C. § 1231(a)(4) .................................................6, 34

8 U.S.C. § 1357 ................................................................35

8 U.S.C. § 1357(g) ...........................................................35

8 U.S.C. § 1357(g)(1) ...........................................7, 36, 37

8 U.S.C. § 1357(g)(9) ................................................7, 36

8 U.S.C. § 1357(g)(10) ..............................................7, 25

8 U.S.C. § 1360(a) ...........................................................27

8 U.S.C. § 1360(b) ...........................................................27

8 U.S.C. § 1373 .........................................................*passim*

8 U.S.C. § 1373(a) ....................................................*passim*

8 U.S.C. § 1373(c) ..............................................................7

8 U.S.C. § 1644 ..........................................................10, 24

28 U.S.C. § 1291 ................................................................4

28 U.S.C. § 1331 ................................................................4

28 U.S.C. § 3702(1) ...........................................................40

N.J. Stat. Ann. § 39:3-10 .................................................29

N.J. Stat. Ann. § 52:17B-98 ..............................................7

N.J. Stat. Ann. §§ 52:17B-97 to -117 ..............................7

N.J. Stat. Ann. §§ 52:17B-97 to -117 ..............................7

**Other Authorities**

8 C.F.R. § 287.7(a) .......................................................6, 35

20 C.F.R. § 422.103 .........................................................39

DHS, *Immigration Detainer – Notice of Action*,
    https://www.ice.gov/sites/default/files/documents/Document/2017/
    I-247A.pdf ...................................................................48

# INTRODUCTION

State and local law enforcement officers fulfill a critical role in keeping the public safe from harm. To do the hard work of solving crimes and bringing criminals to justice, New Jersey law enforcement officers rely on the trust they have built over the years with the communities they serve, including the State's diverse immigrant communities. Part of building that trust means making clear to New Jersey residents that an interaction with state and local law enforcement—whether as the victim of domestic violence or as the eyewitness to a violent crime—will not end with their deportation, no matter their immigration status. That promise is critical because both studies and commonsense confirm that immigrants are less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities. And if victims and witnesses refuse to cooperate, it is that much more challenging to remove criminals from the streets, putting all New Jersey residents at risk.

The Immigrant Trust Directive, issued by New Jersey's Attorney General on November 29, 2018, addresses those concerns directly. The Directive seeks to draw a line between the state and local law enforcement officers responsible for enforcing state criminal law and the federal immigration authorities responsible for enforcing federal civil immigration law. The Directive does this by laying out limits for when state and local officers voluntarily assist in the enforcement of federal immigration law above and beyond the circumstances in which federal law requires them to do

so. Among other things, the Directive clarifies that state and local law enforcement officers cannot participate in civil immigration raids or arrest persons solely based on their immigration status. And the Directive establishes that state and local law enforcement can only rarely refer residents for deportation by sharing their personal information with federal civil immigration authorities, although there are exceptions where such information sharing is required by federal law or would help state and local law enforcement transfer certain criminals and violent individuals to federal immigration detention and keep them off the streets.

Two of New Jersey's counties, which seek to provide voluntary assistance to federal civil immigration authorities in ways that the Immigrant Trust Directive does not permit, argue that this Directive is preempted by federal immigration law. But as the District Court correctly held, Appellants misunderstand the issues in this case. While Appellants repeatedly emphasize that the U.S. Constitution grants the Federal Government broad power to set the rules governing immigration and to enforce them as it sees fit, subject as always to constitutional restrictions, that is beside the point. New Jersey and the District Court both agree that the Federal Government, not the States, sets criteria governing admission to this country, and the Federal Government decides whether any particular alien should be removed. The Federal Government, not the States, maintains an enforcement apparatus for detaining and removing non-citizens. And federal immigration authorities, not state law enforcement officers, are

the ones who decide whether, when, and where to detain those non-citizens. Nothing in the Immigrant Trust Directive indicates otherwise.

The only question this case presents is whether state governments can decide for themselves what voluntary assistance their law enforcement officers may provide to federal immigration authorities enforcing federal immigration law. As every court to consider this has held, including the court below, States retain such authority, and nothing about the Immigration and Nationality Act (INA) preempts their decision to exercise it. The INA does not infringe upon the State's sovereign authority over its laws, resources, and officers. It does not require state and local law enforcement officers to participate in federal civil immigration efforts. And it does not prevent States from setting rules governing that participation. Nor could it. Under the Tenth Amendment, the Federal Government may not conscript state law enforcement into federal service, and may not order States to refrain from adopting policies that limit participation in federal enforcement initiatives. Appellants' preemption claims fail on those bases, and the District Court's decision should be affirmed.

Ultimately, this lawsuit represents nothing more than counties' disagreement with their State's executive policy decisions regarding the efficient administration of law enforcement resources and prudent strategies for fighting crime and building community trust. Although these policy interests are significant, and this subject is a sensitive one over which reasonable officials can differ, such policy disagreements

do not justify this Court's intervention. Whether based on the merits, on a threshold ground, or both, this Court must affirm the dismissal of these suits.

## COUNTERSTATEMENT OF JURISDICTION

The District Court (Wolfson, C.J.) had subject matter jurisdiction under 28 U.S.C. § 1331. On July 29, 2020, the Court granted the State's motion to dismiss all claims asserted by Ocean County, Cape May County, and Sheriff Robert A. Nolan. *See* JA2.[1] Appellants timely appealed. *See* JA30-JA31; A01-A02; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES

1.     Whether political subdivisions of the State, including counties, have the power to challenge their State's law on constitutional grounds in federal court.

2.     Whether the INA expressly or impliedly preempts the Immigrant Trust Directive, and whether a finding of preemption would render the INA inconsistent with the Tenth Amendment's anticommandeering doctrine.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The State is aware of one other case in the District of New Jersey challenging the Immigrant Trust Directive, *United States v. New Jersey*, No. 3:20-cv-01364. The Court (Wolfson, C.J.) granted the State's motion to dismiss on January 27, 2021.

---

[1] "JA" refers to the Appendix submitted by Ocean County in its appeal (20-2754). "A" refers to the Appendix submitted by Cape May County in its appeal (20-2755). "SA" refers to the State's supplemental appendix.

## COUNTERSTATEMENT OF THE CASE

### A. Federal Immigration Law

The Federal Government enjoys broad authority when it comes to setting and enforcing immigration policy. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). In general, and subject to constitutional requirements, the United States can determine "who should or should not be admitted into the country," as well as "the conditions under" which they may remain. *De Canas v. Bica*, 424 U.S. 351, 355 (1976). Congress established its nationwide immigration policy in the INA, which prescribes criteria for admission to the United States and establishes "which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396; *see also Kansas v. Garcia*, 140 S. Ct. 791, 797 (2020) (agreeing the INA sets "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country"); 8 U.S.C. §§ 1151(a), 1226, 1231. These laws establish a comprehensive apparatus for detaining and removing non-citizens. The Department of Homeland Security (DHS) "play[s] a major role in enforcing the country's immigration laws," and its Immigration and Customs Enforcement (ICE) officers are "responsible for the identification, apprehension, and removal of" those who are unlawfully in the country. *Arizona*, 567 U.S. at 397.

Among its various provisions, the INA allows state and local law enforcement officers to assist federal agents in enforcing immigration laws. The INA permits such

officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). Such assistance can "include situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410. Indeed, to take just one example, the INA allows federal officials to ask state and local law enforcement for help in transferring immigrants from state criminal custody to federal immigration detention. Because federal agents remove immigrants who commit state crimes only after they complete their state sentences (with certain limited exceptions), *see* 8 U.S.C. §§ 1227(a)(2) & 1231(a)(4), ICE can ask state and local law enforcement officers to provide advance notice of the date an immigrant will be released from state custody. *See Arizona*, 567 U.S. at 410. ICE typically asks for this by issuing "detainers," which are "requests that [a state or local law enforcement] agency advise [DHS], prior to release of [an] alien, in order for [DHS] to arrange to assume custody." 8 C.F.R. § 287.7(a).

In contrast to the voluntary detainers described above, the INA issues just one direct command to the States. Section 1373 says that, "[n]otwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or

immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). For its part, ICE "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *Id.* § 1373(c).

The INA also permits state and local law enforcement agencies to choose to participate in immigration enforcement directly under federal supervision by signing formal agreements with the Federal Government known as "287(g) agreements." The federal law establishing such agreements says the U.S. "Attorney General may enter into a written agreement with a State, or any political subdivision of a State pursuant to which" state or local law enforcement may perform the "function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). Any such 287(g) agreement may be carried out only "to the extent consistent with State and local law." *Id.* The INA explains that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement." *Id.* § 1357(g)(9).

### B. The Immigrant Trust Directive

New Jersey's Attorney General serves as the "chief law enforcement officer of the State." N.J. Stat. Ann. § 52:17B-98. Under the Criminal Justice Act of 1970, N.J. Stat. Ann. §§ 52:17B-97 to -117, the Attorney General enjoys "power to adopt

guidelines, directives and policies that bind law enforcement throughout" the State. *Paff v. Ocean Cty. Prosecutor's Office*, 192 A.3d 975, 986 (N.J. 2018). The Attorney General's guidelines, directives, and policies all bind local law enforcement "in the day-to-day administration of the law enforcement process." *O'Shea v. Twp. Of W. Milford*, 982 A.2d 459, 465 (N.J. Sup. Ct. App. Div. 2009). Attorneys General have used this authority nearly 90 times over the past two decades, including to address such issues as barring racially-influenced policing (Directive No. 2005-1, Harvey) and implementing the State's bail reform law (Directive No. 2016-6, Porrino).

New Jersey's Attorneys General have also relied on this authority to address state and local law enforcement cooperation with federal immigration authorities. In 2007, then-Attorney General Anne Milgram published a Directive to "establish the manner in which local, county, and state law enforcement agencies and officers shall interact with federal immigration authorities." Directive 2007-3 at 1. That Directive noted that the "enforcement of immigration law is primarily a federal responsibility" and that the overriding mission of state and local law enforcement officers must be "to enforce the state's criminal laws and to protect the community that they serve." *Id.* The Directive thus placed certain limits on when state and local law enforcement officers could participate in federal civil immigration efforts.

In November 2018, Attorney General Grewal promulgated Directive 2018-6, known as the Immigrant Trust Directive, to update the State's rules. The Directive

explains that new guidance was needed because ongoing state and local participation in federal civil immigration enforcement operations "present[ed] challenges to New Jersey's law enforcement officers, who have worked hard to build trust with [the] state's large and diverse immigrant communities." SA1 (introductory clauses). "It is well-established," the Directive notes, that immigrants will be "less likely to report a crime if they fear that the responding officer will turn them over to immigration authorities." *Id.* And whenever individuals are afraid to approach state and local law enforcement as victims or to cooperate as witnesses, it is "more difficult for officers to solve crimes and bring suspects to justice, putting all New Jerseyans at risk." *Id.*; *see, e.g.*, JA40 n.5 (discussing "studies that confirm that immigration-related fears prevent individuals from reporting crimes," including the decreases in reporting by immigrant victims of domestic violence, child abuse, sexual assault, and a range of other serious crimes). The goal of the Directive is thus to draw a clear line between New Jersey's "state, county, and local law enforcement officers, who are responsible for enforcing *state criminal law*, and federal immigration authorities, who enforce *federal civil immigration law*." SA1 (emphases in original).

To be clear, even with those concerns in mind, the Directive describes many instances in which New Jersey law enforcement officers either can or must provide aid to federal civil immigration authorities. Critically, the Directive notes that "law enforcement officers should assist federal immigration authorities when required to

do so by law." *Id.*; *see* SA2 ("[N]othing in this Directive restricts New Jersey law enforcement agencies or officers from complying with the requirements of Federal law or valid court orders, including judicially-issued arrest warrants for individuals, regardless of immigration status."). Beyond compliance with judicial warrants and court orders, SA4 § II.C.3, the Directive adds that "nothing" in its terms "restrict[s], prohibit[s], or in any way prevent[s] a state, county, or local law enforcement agency or official from … [s]ending to, maintaining, or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual," using the exact same language that Congress employed in the INA. *See* SA6 § II.C.10 (citing 8 U.S.C. §§ 1373 & 1644).

The Directive also makes clear that New Jersey law enforcement officers must comply with New Jersey law. As the Directive clarifies, "[n]othing" in its language "shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from … [e]nforcing the criminal laws of this state." SA5 § II.C.1. For that reason, Directive 2018-6 notes explicitly, New Jersey is not "provid[ing] 'sanctuary' to those who commit crimes in this state. Any person who violates New Jersey's criminal laws can and will be held accountable for their actions, no matter their immigration status." SA2 (introductory clauses).

The only issue that the Directive addresses is whether and when New Jersey officers can provide voluntary assistance to federal civil immigration enforcement

efforts "above and beyond" the requirements of federal law. SA1-2 (introductory clauses). The Directive limits, but does not foreclose, such assistance. The Directive states that officers cannot "[s]top, question, arrest, search, or detain any individual based solely on: actual or suspected citizenship or immigration status; *or* actual or suspected violations of federal civil immigration law." SA3 § II.A.1. The Directive prevents officers from "[p]articipating in civil immigration enforcement operations." SA4 § II.B.1. And the Directive explains officers also cannot provide "non-public personally identifying information regarding any individual" or grant "access to any … database" to federal agents when the "sole purpose of that assistance is to enforce federal civil immigration law." *Id.* § II.B.3-4.

But in terms of transferring individuals from state criminal custody to federal immigration detention, the Directive does permit some assistance. While state and local officers cannot "[p]rovid[e] notice of a detained individual's upcoming release from custody" to federal immigration agents for a low-level offender, officers can provide ICE with advance notice of the release date for any inmate who "in the past five years, has been convicted of an indictable crime," or for any inmate who is charged with, or has ever been convicted of, a wide range of offenses, including any first or second degree crime, domestic violence assault, or other violent or serious offense. *Id.* § II.B.5. In the same vein, officers can provide advance notice of release, regardless of the severity of prior criminal history, for any inmate who is "subject to

a Final Order of Removal that has been signed by a federal judge." *Id.* Officers are permitted to detain these inmates "until 11:59 pm on the calendar day on which the person would otherwise have been eligible for release." *Id.*

### C. The Underlying Lawsuits and Decision Below

On September 18, 2019, Ocean County and its Board of Commissioners ("Ocean County") filed suit against Attorney General Gurbir Grewal and the New Jersey Department of Law and Public Safety ("Appellees" or "the State"). JA44. On October 15, 2019, Cape May County and its Sheriff ("Cape May County") followed suit. JA44-45. Both complaints asserted a mix of federal and state law causes of action. *Id.* Ocean County's sole federal claim argued that the INA requires state and local law enforcement officers to share information prohibited by the Directive, and that the latter is preempted. JA44. Cape May raised two federal claims, reiterating Ocean County's view that the INA's information-sharing provisions preempted the Directive, and adding a claim that the Directive unlawfully barred Cape May from entering into a "287(g) agreement" with the U.S. Attorney General "to identify and remove aliens who are subject to removal from the United States." JA45. In light of their commonalties, the District Court consolidated these matters. *Id.*

On July 29, 2020, Chief Judge Freda L. Wolfson granted the State's motion to dismiss the Complaints in their entirety. After finding (over the State's objection) that Ocean County and Cape May County had standing to sue New Jersey in federal

court, JA47-53, the Court agreed that the INA did not expressly or impliedly preempt the Directive, JA55-66 & 71-77, and that a contrary holding would run afoul of the Tenth Amendment's anticommandeering doctrine, JA66-71.[2] Chief Judge Wolfson also denied Cape May's motion for a preliminary injunction as moot. JA35.

The Court comprehensively discussed and rejected Appellants' various claims of preemption. As to express preemption, the Court recognized that Section 1373(a) barred state laws that restricted the sharing of "information regarding the citizenship or immigration status, lawful or unlawful of any individual," but explained that the information at issue in this case—individuals' personally identifiable information, their addresses, and dates they will be released from state or local law enforcement custody—was not information regarding "citizenship or immigration status." JA55-66 (collecting cases adopting the same textual analysis). As to obstacle preemption, the Court held that the INA reflects a series of requirements imposed on the *federal* officials who implement federal immigration law, but does not dictate the role state and local law enforcement have to play in federal immigration enforcement. JA71-77. Moreover, the Court explained, a State's decision not to voluntarily assist in the enforcement of immigration law was not the same as actively impeding enforcement

---

[2] The Court also held that the State was free to order its subdivisions not to enter into "287(g) agreements" with the Federal Government, JA78-79, and it held that the Directive is consistent with the principles of intergovernmental immunity, JA81-84. Appellants do not challenge these rulings on appeal.

of federal law. JA70-71. The court noted that any contrary holding would create a constitutional problem, because a requirement that state and local officers must aid in enforcing federal law would contravene the Tenth Amendment. JA66-71.

After dismissing Appellants' federal claims, Chief Judge Wolfson declined to exercise supplemental jurisdiction over their state law claims. JA84-85. The Court dismissed the state law claims without prejudice so that Appellants could refile them in state court, JA85, which Appellants have done. *See Nolan v. Grewal*, A-4614-19 (N.J. App. Div.); *Ocean v. New Jersey*, A-1341-20 (N.J. App. Div.).

Appellants timely appealed dismissal of their preemption claims.

## SUMMARY OF ARGUMENT

I.      As a threshold matter, Appellants' claims must fail because the political subdivisions of a State lack authority to pursue federal constitutional claims against their States in federal court. Although the District Court disagreed with this analysis, this rule follows from the Supreme Court's repeated instruction that vis-à-vis federal constitutional law, municipal governments are merely subordinate units of the State, created to perform certain delegated functions. Because under federal law the State can curtail those functions at its exclusive discretion, subdivisions cannot claim that the decision to do so violates the constitution. While debate persists on this question, this rule—adopted by another circuit—best respects Supreme Court precedent.

II.     Most importantly, this Court should affirm the District Court's holding that the INA does not preempt the Immigration Trust Directive.

A.     First, the INA does not expressly preempt the Immigrant Trust Directive. As the District Court noted, the only even potentially relevant provision of the INA is Section 1373(a), which prohibits state or local laws that restrict sharing of "information regarding the citizenship or immigration status, lawful or unlawful of any individual." But the Directive *authorizes* officers to share such "citizenship or immigration status" information. As courts have held time and again, the distinct information Appellants wish to share—*i.e.*, an immigrant's driver's license or social security number, address, and date they will be released from state or local custody—does not constitute "citizenship or immigration status" under a textual reading of that phrase. Indeed, Appellants' capacious view, where all sorts of information must be shared that could corroborate someone's immigration status or aid in their detention, would have no logical stopping point. And notably, while other sections of the INA require broader information sharing with immigration authorities—thus confirming that Congress knows how to draft such language when it wishes—those provisions apply only to federal agencies, not to state and local officers.

B.     Second, the INA does not impliedly preempt the Immigrant Trust Directive. Although Appellants emphasize that the State's decision not to voluntarily aid in the enforcement of immigration law makes it harder for federal immigration

authorities to do their jobs, Appellants overlook the distinction between state laws that actually *obstruct* the enforcement of federal law, which are preempted, and laws that merely decline to provide *affirmative* assistance in enforcement efforts, which are not. After all, when it comes to a State's management of its own law enforcement resources, it is that "historic police power—not preemption" that this Court "must assume, unless clearly superseded by federal statute." *United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019), *cert. denied*, No. 19-532 (U.S. June 15, 2020). And no clear evidence suggests that Congress meant to strip States of the power to decide when their officers should assist in enforcing federal law. Aside from Section 1373(a), discussed above, the duties under the INA are imposed on federal agencies, not state and local officers. And the few provisions to implicate the role of state and local officers make clear that their roles are all voluntary, not mandatory.

    C.  The canon of constitutional avoidance bolsters the State's view. The anticommandeering doctrine of the Tenth Amendment ensures that the Federal Government may not conscript state law enforcement into the enforcement of federal law, and further ensures that it may not order States to refrain from adopting policies that limit participation in such federal enforcement initiatives. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018). That doctrine is dispositive. Simply put, because the INA cannot compel state and local law enforcement officers to take part in federal civil immigration enforcement, it also cannot forbid the State's

Chief Law Enforcement Officer from deciding whether they can do so. *See Nixon v. Mo. Mun. League*, 541 U.S. 125, 140 (2004) (explaining "federal legislation" should not be interpreted to "trench on the States' arrangements for conducting their own governments"). Although Appellants argue the Tenth Amendment does not apply to federal statutes involving the sharing of information with federal agencies, no such exception exists—and even if it did, it would not save the INA.

      D.    Cape May County's final arguments are waived and lack merit.

In its brief, the County briefly challenges Sections II.B.4 and VI.A of the Directive, which govern the information state and local law enforcement officers share with their detainees (including to obtain their consent to any immigration interview). The County's argument is waived: it did not challenge these sections below, whether in its Complaint, motion for a preliminary injunction, or opposition to dismissal, so the District Court did not address them. And in any event, it falls short on the merits, as the INA is silent regarding officers' communications with their detainees.

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

This Court's review of a decision dismissing a complaint is plenary. *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010). This Court must "accept as true all factual allegations in the complaint," *Philips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but may not accept a plaintiff's "legal conclusions," which it must evaluate for itself. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I. APPELLANTS CANNOT SUE THEIR STATE IN FEDERAL COURT ON FEDERAL CONSTITUTIONAL GROUNDS.

Although the District Court disagreed with this threshold analysis, this Court should follow the lead of one of its sister circuits and hold that political subdivisions of a State—including counties—lack the legal authority "to challenge state law on constitutional grounds in federal court." *City of San Juan Capistrano v. Cal. PUC*, 937 F.3d 1278, 1280 (9th Cir. 2019). That rule follows directly from constitutional principles governing the relationship between States and their localities, and courts have therefore applied it to dismiss prior challenges under the Supremacy Clause. *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1363-64 (9th Cir. 1998). It disposes of Appellants' preemption claims.

While this rule admittedly remains the subject of an active debate among the courts of appeals, the position that localities cannot sue their creator States reflects black letter constitutional principles. The Supreme Court has repeatedly addressed the relationship between States and their localities under federal law, counseling that the latter "are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 607-08 (1991); *Trenton v. New Jersey*, 262 U.S. 182, 185-86 (1923) (same); *see also, e.g.*, *HIAS v. Trump*, No. 20-1160, 2021 WL 69994, *4 (4th Cir. Jan. 8, 2021) (referring to the "fundamental principle[] of state

sovereignty" that "localities are political subdivisions of their states and possess only the authority granted to them by their state governments"). It follows that localities "never were and never have been considered as sovereign entities" for purposes of federal law, but are "subordinate unit[s] of government created by the State to carry out delegated government functions." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362-63 (2009). That is why, with respect to federal law, a "State may withhold, grant or withdraw powers and privileges as it sees fit." *Id.* at 363 (citing *Trenton*, 262 U.S. at 187). If the federal constitution has nothing to say about the relationship between States and counties, logically counties cannot bring federal constitutional claims in federal court when their States decide to adjust those powers.

It is thus no surprise that precedent forecloses such suits. Indeed, the Supreme Court has held that a State's political subdivisions have "no privileges or immunities under the federal constitution" to invoke against a State. *Williams v. Baltimore*, 289 U.S. 36, 40 (1933). The Court has relied on this rule to reject claims from localities brought under the Contract Clause, Just Compensation Clause, and Equal Protection Clause. *See, e.g.*, *Coleman v. Miller*, 307 U.S. 433, 441 (1939) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."); *R.R. Comm'n v. L.A. Ry. Corp.*, 280 U.S. 145, 156 (1929); *Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907); *Newark v. New Jersey*, 262 U.S.

192, 196 (1923); *Trenton*, 262 U.S. at 185-86. The Supreme Court has never adopted any exception to that categorical rule, and it applies with full force here.

There are two different ways this rule has been framed. One approach, taken by the Ninth Circuit, is to treat this as a rule of standing. *See, e.g.*, *City of San Juan*, 937 F.3d at 1280 (holding that "political subdivisions lack standing to challenge state law on constitutional grounds in federal court"). The Supreme Court itself described this rule as a standing doctrine. *See Coleman*, 307 U.S. at 441. To have standing, a plaintiff must suffer a "judicially cognizable" injury, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992), and cases from *Williams* to *Ysursa* confirm that localities' injuries at the hands of their State is not one federal law recognizes. Alternatively, even if this Court does not believe this rule fits the Article III framework, this Court can apply it as a categorical rule of constitutional law. *See City of San Juan*, 937 F.3d at 1282-84 (Nelson, J., concurring) (questioning whether the standing rationale is correct, but noting a categorical merits-based bar could still be appropriate). That approach, too, follows from the Court's decisions: because federal law permits the State to grant or withdraw powers from its subdivisions as it sees fit, a county cannot prevail on a federal claim when the State does exactly that.[3]

---

[3] This Court has likewise recognized that a per se rule preventing subdivisions from "assert[ing] constitutional claims against their own state governments" appears to reflect "the law of the land." *Amato v. Wilentz*, 952 F.2d 742, 755 (3d Cir. 1991). While the Third Circuit has not resolved whether this is a rule of standing or on the merits, *see id.* (holding that "these cases may not be standing cases (in the modern

The District Court's contrary conclusion, though consistent with the decisions of some other circuits, was therefore erroneous. Though the court below rightly held that "[t]raditionally, political subdivisions have lacked standing to sue their creating state," it believed more recent Supreme Court precedents had limited that principle "to the particular prohibitions of ... the Contracts Clause and the Due Process Clause of the Fourteenth Amendment" involved in *Trenton* and its progeny. JA49 (citing *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019); *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619 (10th Cir. 1998); *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979)). Said another way, the District Court and the circuits on which it relied believe subdivisions are barred from bringing some claims (those under the Contract, Equal Protection, and Just Compensation Clauses) but can pursue others (including those under the Supremacy Clause). Not only is that line-drawing exercise difficult to square with the language of Supreme Court precedents, *see Branson Sch. Dist.*, 161 F.3d at 628 (accepting its approach is in contrast to "the sweeping breadth of Justice Cardozo's language" in *Williams*), but it is even harder to square with the underlying principles motivating the rule—namely, the sweeping discretion States

---

sense of the term), but instead holdings on the merits"), that bears only on the rule's rationale, and not on whether the rule is correct. And although *Amato* suggested that "judicial support for this rule may be waning with time," *id.*, the Supreme Court has not changed course. Instead, the Court has reiterated that the States can withdraw all powers from their subdivisions. *See Ysursa*, 555 U.S. at 362.

enjoy under federal law to govern their localities, which is true no matter the precise provision on which a subdivision is relying. *See Ysursa*, 555 U.S. at 362.[4]

Against all this, the District Court and supporting circuits identify two sources of support: first, that the Supreme Court "repeatedly entertained suits against a state by a subdivision of the state, including cases under the Supremacy Clause," JA50 & n.10, and second, that the Court addressed this issue in *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). JA49. As to the former, while the Court has sometimes entertained such suits by subdivisions, standing was not addressed—and the *failure* to address a jurisdictional question does not prove jurisdiction was actually proper. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 832-33 (10th Cir. 2014) ("The Supreme Court has told us that even on questions of jurisdiction, which courts always have a duty to consider, precedent is not established by the Court's decision to hear a case if the Court does not address the issue of jurisdiction."). And while *Gomillion* did speak to standing, that case is inapposite. There, the Court held only that *individual residents* could assert constitutional rights against a State, prompting

---

[4] Moreover, this alternative line is unpersuasive. In these circuits, whether a locality can sue a State turns on whether the "constitutional provision that supplies the basis for the complaint was written to protect individual rights"—which a county cannot bring—"as opposed to [ones written to protect] collective or structural rights," which it can. *Branson Sch. Dist.*, 161 F.3d at 628. But the Supremacy Clause "is not the source of *any* federal rights," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015), let alone structural ones. So even were this alternative test correct, it remains unclear how subdivisions' Supremacy Clause challenges could go forward.

the Court to define the contours of when States may limit *those* rights. 364 U.S. at 344. As *Gomillion* concluded, States lack "power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations," since such actions could conflict with *individuals'* rights. *Id.* But the Court was silent on whether a political subdivision itself had federal rights to support a lawsuit against its State. To overrule its precedent holding that political subdivisions lack authority to sue their creator States, the Court must speak with greater clarity.

## II. FEDERAL LAW DOES NOT PREEMPT THE IMMIGRANT TRUST DIRECTIVE.

The Federal Government has plenary authority to set immigration policy for the Nation and to enforce that policy. While no State can override or interfere with federal immigration law, every court to consider the issue has found that States can nevertheless make their own decisions regarding when to voluntarily participate in enforcement of federal immigration law. New Jersey's Immigrant Trust Directive fits comfortably within that regime for three reasons. First, no provision of the INA expressly preempts the Directive. Second, the INA also does not impliedly preempt the Directive, and the two can easily coexist. Third, this position is confirmed by the canon of constitutional avoidance, because a reading of the INA that prevents States from declining to participate in the enforcement of federal immigration law violates the Tenth Amendment's anticommandeering doctrine.

A.     The INA Does Not Expressly Preempt The Immigrant Trust Directive.

Express preemption "arises when there is an explicit statutory command that state law be displaced." *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the V.I.*, 218 F.3d 232, 238 (3d Cir. 2000). The only provision of the INA that potentially speaks to the Directive is Section 1373(a), which prohibits the State from restricting the communication of information "regarding the citizenship or immigration status, lawful or unlawful, of any individual" between "any government entity or official" and the Federal Government. 8 U.S.C. § 1373(a).[5] But the Directive allows for full compliance with Section 1373's terms. The Directive clarifies that "[n]othing" in the policy "shall be construed to restrict, prohibit, or in any way prevent a state, county, or local law enforcement agency or official from ... [s]ending to, maintaining, or receiving from federal immigration authorities information regarding the citizenship or immigration status, lawful or unlawful, of any individual." SA6 § II.C.10 (citing 8 U.S.C. §§ 1373 & 1644). Because New Jersey law does not do what Section 1373 prohibits, express preemption cannot apply.

---

[5] Section 1644 also governs communications between state and local government entities and the Federal Government regarding someone's "immigration status." 8 U.S.C. § 1644. Because it uses the same language as Section 1373—and is narrower, because (unlike Section 1373) this provision does not mention "citizenship status"— the brief focuses only on section 1373. If Section 1373 does not expressly preempt New Jersey law, *a fortiori* Section 1644 does not either.

In response, Appellants argue that Section 1373 actually requires the sharing of *other* kinds of information—*i.e.*, "non-public personally identifying information regarding any individual" and/or "notice of a detained individual's upcoming release from custody." JA55; CMC Br. 12-14; OC Br. 19. But the phrase "information regarding the citizenship or immigration status, lawful or unlawful" means just what it says: "whether the individual is a U.S. citizen, green card holder, or holds some other legal or unlawful status in the United States." JA65; *see also California*, 921 F.3d at 889 (agreeing this phrase "is naturally understood as a reference to a person's legal classification under federal law"); *Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 333 (E.D. Pa. 2018) (holding this provision refers to "an individual's category of presence in the United States—*e.g.*, undocumented, refugee, lawful permanent resident, U.S. citizen—and whether or not an individual is a U.S. citizen, and if not, of what country"), *vacated in part on other grounds*, 916 F.3d 276 (3d Cir. 2019). Indeed, when Congress used this language elsewhere in the INA, it provided only one example—namely, the "knowledge that a particular alien is not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). And as a matter of plain English, "no plausible reading of 'information regarding' 'immigration status' encompasses the state or local release date of an inmate who is an alien," *Steinle v. San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019), or the other kinds of personal information at issue in this appeal, *California*, 921 F.3d at 889.

The fact that Section 1373(a) refers to information "regarding" an individual's immigration status does not change the analysis. While the term "regarding" can at times "ha[ve] a broadening effect," *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752 (2018), the Supreme Court has cautioned that this term cannot be "taken to extend to the furthest stretch of its indeterminacy," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *see also California*, 921 F.3d at 892 (same). Although Appellants believe this phrase sweeps in any information relating to federal removability or detention, that position lacks any meaningful limiting principle. After all, "the range of facts that might have some connection to federal removability or detention decisions is extraordinarily broad," including information like "vaccination history, education, financial resources, and [political] membership." *California*, 921 F.3d at 892 (citing 8 U.S.C. § 1182); *see also* JA64 (agreeing that although "regarding has a broadening effect, to read it as broadly as advanced by [Appellants] would impermissibly expand [the INA] ... to sweep in *any* information, including personal identifying data" about any noncitizen, which is "an unreasonable result, that the statute based on its plain wording, cannot contemplate"). But none of that is covered by Section 1373, because as courts have found, "[t]he phrase 'information regarding' includes only information relevant to *that* inquiry," *Philadelphia*, 309 F. Supp. 3d at 333 (emphasis added)—namely, to someone's "immigration status, lawful or unlawful." *See* JA64.

The INA's structure confirms what these courts all found as a matter of text. Importantly, "Congress has used more expansive phrases in other provisions of Title 8 when intending to reach broader swaths of information." *California*, 921 F.3d at 892. Indeed, the INA requires all *federal* agencies to provide "[a]ny information in any records … as to the identity and location of aliens" to ICE, 8 U.S.C. § 1360(b), and calls on the Social Security Administrator to provide "information regarding the name and address" of undocumented individuals reporting employment earnings, *id.* § 1360(c). Congress used even broader language in another section, "mandating the inclusion of 'such other relevant information as the Attorney General shall require as an aid' to the creation of a central index of noncitizens entering the country." *California*, 921 F.3d at 892 (quoting 8 U.S.C. § 1360(a)). As these provisions show, Congress knew exactly how to refer to the sharing of a broader array of information relating to immigrants, but it did not do so in enacting Section 1373. *See Steinle*, 919 F.3d at 1164 (explaining that "Congress certainly could have added" the "explicit" language that Appellants seek, "but it did not").

Cape May responds with a structural argument based on Section 1373(c), but courts have consistently found that this provision *undermines* preemption. Cape May emphasizes that Section 1373(c)—which requires ICE to share "immigration status" information with state officials—does not use the term "regarding," while Section 1373(a) does. Cape May argues this means Section 1373(a) must have wide-ranging

scope and cover the information described above. But courts have drawn precisely the opposite inference from this distinction—namely, "the fact that subpart (c) only concerns itself with immigration status suggests, given § 1373's focus on reciprocal communication between states and the federal government, that immigration status is the extent of subpart (a)'s reach." *California*, 921 F.3d at 892; *see also* JA59 n.15 (same). In light of the INA's structure, that is the only reasonable conclusion. Had Congress really intended to mandate a broad array of information sharing, it would have repeated the language from other parts of the INA, rather than copying Section 1373(c) and just adding the word "regarding." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not … hide elephants in mouseholes"). Appellants' reading of Section 1373(a) does not hold up.[6]

Finally, Ocean County's effort to provide a limiting construction on appeal is unavailing. Before this Court, Ocean County tries to overcome the text and structure of the INA, the decision below, and the decision of other courts by claiming it wishes only to share information "closely corroborative" of immigration status. *See* OC Br. 1-3; 14-19. Indeed, Ocean County recognizes (in contrast to the Cape May Appellants) that adoption of "an unbridled reading of 8 U.S.C. § 1373 … would

_____

[6] Cape May also "cherry-pick[s]" legislative history to support its broad view. JA55 n.19. But as the District Court explained, because the text is clear, there is no basis to resort to legislative history. *See id.*; *Byrd v. Shannon*, 715 F.3d 117, 123 (3d Cir. 2013) ("[L]egislative history may be referenced only if the statutory language is written without a plain meaning, *i.e.*, if the statutory language is ambiguous.").

usher in types of information tenuously related to citizenship or immigration status,"
OC Br. 2, and that "release date information or even last known addresses" is not
closely corroborative of status, OC Br. 19. Ocean County instead contends that
"[s]ocial security and driver's license numbers" are all that is "ensnared in this
appeal." OC Br. 2. But while the State agrees release dates and addresses do not
satisfy the plain language of Section 1373, Ocean County's latest position gets
Appellants no further.

There are a number of problems with Ocean County's approach. For one, it is
not clear what exactly closely corroborative means or how it would ultimately limit
the information covered by Section 1373. The term "closely corroborative" does not
appear in the text of Section 1373, the rest of the INA, or any relevant federal statute
or precedent. And so it is not clear how to apply this test in practice: although Ocean
County believes an individual's social security and driver's license numbers suffice
and that their address does not, it does not explain *why* that is, let alone why "closely
corroborative" information would not include date of birth, marital status, or other
personal data.[7] For another, although Ocean County is adamant that its approach can

---

[7] The social security numbers and driver's license numbers at issue provide a perfect
example: failure to provide such numbers is hardly indicative of immigration status.
For one, many citizens lack driver's licenses—whether because they did not apply
for one or do not qualify—so failure to provide a valid number is not dispositive as
to status. For another, undocumented individuals will soon be able to obtain New
Jersey driver's licenses, N.J. Stat. Ann. § 39:3-10, and noncitizens with permission
to work in the United States can get social security numbers. 20 C.F.R. § 422.103.

square with the case law and the INA, that is not so: as laid out above, "immigration status, lawful or unlawful" refers to an individual's category of presence, not their social security number or driver's license. Indeed, other cases explicitly rejected the position that personal data like social security numbers are covered by Section 1373. *See California*, 921 F.3d at 890; *San Francisco v. Barr*, 965 F.3d 753, 764 (9th Cir. 2020) (holding the INA "by its terms, only concerned information strictly pertaining to immigration status (*i.e.* what one's immigration status is)"). Simply put, Section 1373 speaks only to immigration status, not information federal agencies may use in a corroborative manner. Express preemption does not apply.

B.    The INA Does Not Otherwise Preempt The Immigrant Trust Directive.

Because the INA does not expressly preempt Section II.B.5, Plaintiffs are left to argue that the INA *impliedly* preempts decisions regarding state and local officer participation in immigration enforcement. Appellants rely on "conflict preemption," under which a law is preempted if it "stand[s] as an obstacle to the accomplishment and execution" of a federal statute. *Arizona*, 567 U.S. at 399. Appellants argue that the Directive's restrictions on immigration-related cooperation are an impermissible obstacle to the INA's execution because they encroach on the Federal Government's

_____

On the other hand, U.S. citizens can and have offered fraudulent numbers to law enforcement. If this is the type of link the County views as "closely corroborative," then any number of other facts could qualify. At the end, what Ocean County now proposes as a limiting principle is, instead, just as limitless and unwieldy as the approach that the District Court (like many others) already properly rejected.

"broad, undoubted power over the subject of immigration and the status of aliens." *Id.* But because the INA does not compel state and local law enforcement to assist in enforcing federal immigration law, the State's decision to decline to do so cannot constitute unlawful obstruction of the federal statutory scheme.

As an initial matter, Appellants improperly describe the Directive's design. The Directive is not a statement of immigration policy, and it is not an "intentional effort … to frustrate immigration enforcement initiatives." CMC Br. 1. Instead, the Directive agrees that the "responsibilities" of "enforcing civil immigration violations … fall to the federal government," and that the Federal Government gets to decide who should be removed. SA1. Further, the Directive confirms that "officers should assist federal immigration authorities when required to do so by law," *id.*, and simply lays out when officers may volunteer assistance to federal immigration authorities "above and beyond" those requirements. SA1-2. Even then, the Directive permits officers to provide aid in a variety of cases. SA4 § II.B.5. At bottom, the Immigrant Trust Directive does not give anyone a right to remain in the United States, or limit who federal immigration authorities can detain or where and when they can detain them. It simply delineates New Jersey's own voluntary role in the process.

The fatal problem for Appellants is the failure to grasp the distinction between state laws that *obstruct* enforcement of federal laws, which are preempted, and laws that decline to provide *affirmative* assistance in federal enforcement efforts, which

are not. As the Seventh Circuit put the point in an analogous matter, "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities." *Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018); *see also California*, 921 F.3d at 889 (holding the decision to refrain from aiding in immigration enforcement "is not the same as impeding"); JA76 (noting that "in merely defining the contours of New Jersey's and its localities' involvement in the enforcement of federal civil immigration law," New Jersey does "not encroach onto the regulation of immigration"). Bluntly, Appellants' view of this Directive as an "effort to frustrate enforcement of federal immigration law in New Jersey," CMC Br. 4, is nothing more than a "red herring." *Chicago v. Sessions*, 888 F.3d at 282; *see also* JA74-76.

Because Section II.B.5 simply reflects a choice as to when state and local law enforcement may assist in enforcing federal immigration law by sharing information not required under Section 1373(a), it falls comfortably within New Jersey's police powers. *See* JA70. As courts have consistently held, "[t]he choice as to how to devote law enforcement resources—including whether or not to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities," including not to "inform[] federal authorities when persons are in their custody and provid[e] access to those persons." *Chicago v. Sessions*, 888 F.3d at

282. Because a State's "ability to regulate its internal law enforcement activities is a quintessential police power," that "historic police power—not preemption" is what a Court "must assume, unless clearly superseded by federal statute." *California*, 921 F.3d at 887; *see also Parker v. Brown*, 317 U.S. 341, 351 (1943) (noting "[i]n a dual system of government in which, under the Constitution, the states are sovereign … an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress"); *Chicago v. Barr*, 961 F.3d 882, 891-92 (7th Cir. 2020) (agreeing that a State which decides "its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences, is exercising its police power—an area of power long recognized as resting with the states").

Appellants cannot offer evidence—let alone clear evidence—that the INA is intended to strip the States of the power to decide when their own officers should volunteer to assist in the enforcement of federal immigration law. *See California*, 921 F.3d at 889 (holding the INA "provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities"). That conclusion comes as no surprise. "With the exception of § 1373(a)" (discussed above), the key portions of the INA "direct *federal* activities, not those of state or local governments." *Id.* at 887; *see also* JA73-74 (noting the INA's choice to "impose obligations solely on the federal government … is important" because it means state and local agencies "have

no duty to assist the federal government with carrying out those obligations"). For example, although Congress decided to allow federal immigration agents to remove certain immigrants only after they had completed their state criminal sentences (with specified exceptions), 8 U.S.C. §§ 1227(a)(2) & 1231(a)(4), the statutes only impose the relevant duties on federal officials—to arrest and detain aliens, to do so promptly, and to do so after those aliens finish serving any criminal sentences.

Conversely, that means Sections 1226 and 1231 do not impose duties directly on state and local officials. *See California*, 921 F.3d at 887; *see also, e.g.*, *Arizona*, 567 U.S. at 410 (finding that "State officials *can* also assist the Federal Government by responding to requests for information about when an alien will be released from their custody" (emphasis added)). It is possible Congress "presume[ed] that states would conduct their law enforcement activities in concert with federal immigration efforts," but assumptions are not enough for a finding of preemption where Congress "opted not to codify its belief" in the plain text. *California*, 921 F.3d at 887. And the plain text is clear: the INA permits federal agents to ask state and local officials for advance notice of someone's release, but it does not require state and local officials to answer. *See* JA76 (finding the Directive is a "clear exercise of the State's police power to regulate the conduct of its own law enforcement agencies," and "[t]here is no indication that Congress, in enacting the INA, sought to usurp that power").

Two other aspects of the INA's structure confirm that participation in federal civil immigration operations, including through the provision of information about detainees and other individuals, is strictly voluntary. First, the fact that the Federal Government could issue a "detainer" seeking information covered by Section II.B.5 only confirms that each State retains discretion. As a matter of circuit precedent and federal regulations, any immigration detainer seeking personal data or release date information is merely a "request[]," 8 C.F.R. § 287.7(a), and therefore responding is "permissive, not mandatory," *Galarza v. Szalczyk*, 745 F.3d 634, 642 n.9 (3d Cir. 2014); *see also id.* at 640 (noting "no U.S. Court of Appeals has ever described ICE detainers as anything but requests"); *id.* at 643 (holding that "settled constitutional law clearly establishes that [detainers] must be deemed requests," and not mandatory orders); *California*, 921 F.3d at 887 (same). The fact that States can ignore detainers is powerful evidence that the INA does not require them to provide the information at issue here—and thus does not preempt orders that proscribe doing just that.

Second, another provision of the INA—8 U.S.C. § 1357(g)—explicitly leaves to States the discretion to decide whether to assist immigration enforcement efforts. As noted above, a "287(g) agreement" is one that allows law enforcement officers to be deputized as federal immigration agents. But Section 1357, which lays out the rules for such agreements, does not preempt a State's decision either to refrain from entering into such an agreement or to stop a locality from doing so. For one, 287(g)

agreements are voluntary, not mandatory. *See* 8 U.S.C. § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement."); *El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). For another, the INA says 287(g) agreements can be carried out only "to the extent consistent with State and local law," 8 U.S.C. § 1357(g)(1), which means "some state and local regulation of cooperation is permissible." *El Cenizo*, 890 F.3d at 178; *see also id.* (noting that federal law "does not suggest the intent—let alone a 'clear and manifest' one—to prevent states from regulating" the decision to enter such agreements). Ultimately, Section 1357 "regulates *how* local entities may cooperate," but leaves it to the States to "specif[y] *whether* they cooperate." *Id.* That provides more evidence that the INA does not preempt state laws governing voluntary assistance.

In short, while the INA sets the Nation's immigration priorities, the Immigrant Trust Directive does not conflict with those priorities, and it does not prevent federal agents from doing their job. *See Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (noting "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."). All the State has done is establish what assistance it will offer. The INA does not preclude it from making that choice.[8]

---

[8] Ocean County also briefly asserts that the Directive is barred by field preemption, which arises only if "Congress regulates a domain so pervasively that it leaves no room for state regulation." *Roth v. Norfalco LLC*, 651 F.3d 367, 374 (3d Cir. 2011).

C.    The Canon of Constitutional Avoidance Bolsters The Conclusion That The INA Does Not Preempt The Directive.

The canon of constitutional avoidance supports the State's reading of the INA. This canon reflects the "cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its constitutionality, courts will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 223 (3d Cir. 2018). That is particularly important when, as here, the case presents issues of federalism, since courts must "be certain of Congress's intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014). Appellants' reading requires state and local officials to aid in federal immigration enforcement, or at the very least bars the State from regulating its voluntary decisions about how to do so. Because that approach would contravene the Tenth Amendment, this Court must not adopt it.[9]

---

OC Br. 21-22. But as Chief Judge Wolfson found, the INA ensures that *States* have the right to decide the extent of their participation in immigration enforcement, and thus by definition the statute does not cover the field on that question. *See* JA81; *California*, 921 F.3d at 891; 8 U.S.C. § 1357(g)(1).

[9] To be clear, the State agrees with the District Court that there is no reason to apply the canon of constitutional avoidance because Appellants' interpretation is "simply not supported by the plain meaning of the statute"—meaning their claims fail even without resort to this canon. JA56 n.14. Should doubt persist on that score, however, the Tenth Amendment analysis also forecloses Appellants' claims.

Under the Tenth Amendment, federal statutes "may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). That principle, best known as the anti-commandeering doctrine, is straightforward: since the Constitution "'confers upon Congress the power to regulate individuals, not States,'" Congress lacks "the power to issue direct orders to [state] governments." *Murphy*, 138 S. Ct. at 1476 (quoting *New York v. United States*, 505 U.S. 144, 166 (1992)); JA68-71 (same). That is true no matter whether the federal law tells state officials to "enact" a certain law or take specific action, or to "refrain" from enacting laws. *Id.* at 1478. It follows that States have the power to "decline to administer [a] federal program." *New York*, 505 U.S. at 177; *see also Printz*, 521 U.S. at 909-10 (noting that the States may "refuse[] to comply with [a] request" to administer any federal statute); *id.* at 935 (invalidating federal law that required local law enforcement to perform background checks on gun buyers because it "command[ed] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). At bottom, state governments retain the "prerogative" to refuse a role in implementing "Congress's desired policy, 'not merely in theory but in fact.'" *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012).

The central theme of the anticommandeering cases—that the States have no obligation to assist the Federal Government with enforcing federal law—advances a

number of important goals. Most obviously, the States' ability to opt out of federal programs "serves as 'one of the Constitution's structural protections of liberty'" by stopping Congress from conscripting thousands of state officers into its regulatory machinery. *Murphy*, 138 S. Ct. at 1461 (quoting *Printz*, 521 U.S. at 921). This also "promotes political accountability" by enabling residents to know "who to credit or blame" for any particular governmental action. *Id.* at 1477; *see also New York*, 505 U.S. at 169 (same). And it "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1461; *see also Printz*, 521 U.S. at 922 (noting that Congress cannot "impress into its service—and at no cost to itself—the police officers of the 50 States"); JA67 (discussing the benefits of the anticommandeering doctrine). If Congress wants to enforce a policy, Congress (not the States) must take ownership, and Congress (not the States) must pay the costs.

As a threshold matter, an interpretation of the INA that *requires* state and local officials to aid the Federal Government in enforcing federal immigration laws would violate the Tenth Amendment. That interpretation would prevent these officials from "refus[ing] to comply with [a] request" to administer a federal law, *Printz*, 521 U.S. at 909-10, and it would instead "command" state officers to participate, *id.* at 935. It follows, this Court has already held, that "immigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme." *Galarza*, 745 F.3d at 644; *see also California*, 921 F.3d at 889 (same). In

other words, in order for the INA to be constitutional, state and local officials must have discretion not to participate in civil immigration enforcement. *See* JA76 (noting that Congress "cannot strong arm the State into doing its own bidding.").

Because state and local officers have discretion not to participate in federal immigration enforcement, the only remaining question is whether Congress can bar States from adopting rules governing how their own officers exercise that discretion. After *Murphy*, the answer is clear: Congress lacks "the power to issue direct orders to governments of the States," including orders to "refrain" from enacting certain kinds of laws. 138 S. Ct. at 1476. And that is what Plaintiffs' broad reading of the INA represents: a direct order that a State "not prohibit, or in any way restrict, any government entity or official" from assisting in immigration enforcement. 8 U.S.C. § 1373(a). Just as the Professional and Amateur Sports Protection Act—which was held unconstitutional in *Murphy*—made it "unlawful for a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law" sports gambling, 28 U.S.C. § 3702(1), so too is a prohibition on state policies that limit voluntary state and local assistance in immigration enforcement a "command to the States" that "the anticommandeering rule does not allow." *Murphy*, 138 S. Ct. at 1481; *see also* JA69-70 (noting that Appellants' view of the INA would "violate the Tenth Amendment" because it would "unequivocally" and directly "dictate" the State's policies).

In truth, Appellants' reading of the INA offends the Tenth Amendment even more than the law in *Murphy*. Not only does their approach impermissibly order the State to refrain from enacting policies, but it also allows the Federal Government to dictate how decision-making power is distributed within the State—by reassigning the issue of whether to provide voluntary immigration assistance from New Jersey's Chief Law Enforcement Officer to its line officers or its local governments. But the Supreme Court has cast doubt on laws that "interpos[e] federal authority between a State and its municipal subdivisions, which … are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them." *Nixon*, 541 U.S. at 140. Appellants' approach thus runs contrary to the "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power." *Id.*; *see also* JA71 (noting as problematic federal laws that interfere with "legitimate exercise of the State's police power and regulation of its law enforcement resources"); *cf. HIAS*, 2021 WL 69994, *9 (criticizing a federal order that "create[d] impermissible power shifts between states and their localities" by allowing local agencies to "override the state's" policy decision).

It is thus no surprise that, after *Murphy*, virtually every court to consider the issue has agreed that the INA cannot prevent state governments from issuing rules

that govern their state and local law enforcement officers' voluntary participation in federal civil immigration initiatives. *See California*, 921 F.3d at 890 (holding "the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal"); JA57-58 & 69 n.20 (collecting district court cases). *California* is particularly relevant. In that case, the Ninth Circuit upheld a state law limiting the assistance that state and local law enforcement could provide to federal immigration authorities. Notably, the panel did so based on reasoning that applies here: if state and local officers can make a "lawful decision not to assist federal authorities," that decision cannot be "made unlawful when it is codified as state law" without running afoul of the anticommandeering doctrine. *California*, 921 F.3d at 890; *see also Chicago v. Barr*, 961 F.3d at 909 (agreeing this "restriction of the state or local government would constitute direction or control over the communications by the state or local police").

Moreover, none of the possible exceptions to the anticommandeering doctrine apply. Appellants first claim that the INA is a straightforward preemption provision applicable to everyone—state and private actors alike—and so it is not an unlawful attempt to commandeer States. But as in *Murphy*, that claim gets nowhere. Section 1373 is "not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors." *Murphy*, 138 S. Ct. at 1481. Instead, it speaks only to the conduct of "a Federal, State, or local government entity

or official." 8 U.S.C. § 1373(a). The statute "does not confer any federal rights on private actors," and it does not "impose any federal restrictions on private actors." *Murphy*, 138 S. Ct. at 1481. To the contrary, "it is the state's responsibility to help enforce federal law, and not conduct engaged in by both state and private actors, that is at issue." *California*, 921 F.3d at 890; *see also* JA57 (noting that the relevant INA sections "are not preemption provisions" because "they do not regulate private actors as *Murphy* requires") (quoting *Colorado v. Dep't of Justice*, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020)); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018). That Section 1373 regulates how states share information *about* private parties does not mean it regulates private parties themselves. *See California*, 921 F.3d at 889.

Appellants' other argument fares no better. Appellants claim that there is an exception to the anticommandeering doctrine for federal laws that facilitate sharing of information with federal officials. But the courts to consider this argument have rejected it for several reasons. First, the Supreme Court has never actually found this exception exists. *See* JA69-70 n.21 (noting that Appellants invent this information-sharing exception from "dicta from *Printz* … recount[ing], and then reject[ing], the Government's specific arguments made in the context of that case," but holding "the *Printz* Court did not carve out any exception to the anticommandeering doctrine."). And there are good reasons to think it does not. For one, information sharing—like

any form of state assistance—can involve significant regulatory burdens, which the Federal Government may not shift to state and local law enforcement. *See Chicago v. Sessions*, 321 F. Supp. 3d 855, 866-73 (N.D. Ill. 2018). For another, information sharing could still undermine "political accountability" by leading affected communities to believe States are playing a role in federal immigration enforcement and then hold States responsible for it, *Murphy*, 138 S. Ct. at 1477—the precise concern that animates the Immigrant Trust Directive. Absent clearer evidence from the Supreme Court that the exception exists, this Court should not create it.

In any event, this Court need not conclusively resolve whether this exception exists because it would not save the INA. After all, the INA does more than require mere provision of information—it specifically prohibits the States from enacting any laws that restrict the provision of certain information, running into *Murphy*'s holding that "Congress cannot issue direct orders to state[s]." 138 S. Ct. at 1478; *see also* JA69 n.21 (agreeing the INA "do[es] not simply require disclosure of information, but instead directly tell[s] states and state actors that they must refrain from enacting certain state laws"); *Oregon*, 406 F. Supp. 3d at 973 (noting Appellants' reading of the INA includes "more than just information-sharing provisions" and "prevent[s] state and local policymakers from enacting a wide range of information-governance rules . . . and force them 'to stand aside and allow the federal government to conscript the time and cooperation of local employees'"); *Chicago v. Sessions*, 321 F. Supp.

3d at 872; *Colorado*, 455 F. Supp. 3d at 1059. It is one thing to require that everyone provides information; it is quite another to bar the Chief Law Enforcement Officer from telling the State's law enforcement how or when to exercise the discretion that they retain on this score. *See Nixon*, 541 U.S. at 140.

The cases from the Second Circuit cited by Appellants and the District Court do not undermine this analysis. First, Cape May County relies on *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), for the proposition that Section 1373 withstands Tenth Amendment scrutiny. *See* CMC Br. 4, 21. But that case upheld the INA only by drawing a line between (unconstitutional) laws that "affirmatively conscript states … into the federal government's service" or "compel states or localities to require or prohibit anything," and (purportedly constitutional) statutes that "prohibit state and local governmental entities or officials" from taking certain action. *Id.* at 35. That is the very distinction *Murphy* called "empty" when it decided that a direct command to a State to *refrain* from taking particular actions still violates the Tenth Amendment. 138 S. Ct. at 1478; *see also* JA79. Second, while the court below noted that a recent Second Circuit panel indicated Section 1373 might be valid, *see* JA 69 (citing *State of New York v. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020)), there is a good reason neither Appellant relies upon that decision. That appeal involved the Department of Justice's decision to tie law enforcement funding to compliance with Section 1373. 951 F.3d at 90. The court found Section 1373 valid

only because that provision's constitutionality was "properly assessed [in that case] not on the face of the statute, but as applied to clarify a federal funding requirement." *Id.* at 111. The panel held that it would "not here decide" whether Section 1373 was constitutional outside of the funding-restriction context—the question presented here. *Id.*[10] That is hardly enough to overcome the precedents and principles discussed above.

D. <u>Cape May County's Remaining Challenge Is Waived</u>.

Although Ocean and Cape May Counties primarily attack the rules in Sections II.B.2 and II.B.5 governing what information law enforcement officers share with federal immigration authorities, Cape May County briefly challenges Sections II.B.4 and VI.A too. These provisions, however, do not govern when law enforcement can share information with federal authorities—meaning that they do not implicate the questions discussed above. Instead, Section II.B.4 requires that if state and local law enforcement officers make their own detainees available for immigration interviews with federal authorities, they first ensure that the detainee understands the interview is voluntary and that they have a right to counsel. SA4. Section IV.A, for its part, says that law enforcement must notify a detained individual if federal immigration authorities ask to interview them, to be notified about their release, and/or to have

---

[10] Moreover, the case remains the subject of a pending petition for certiorari, and the decision could be vacated as moot in light of a change in policy by the Department. *See* Petn. for Certiorari, *New York v. Dep't of Justice*, No. 20-795 (U.S.).

them held beyond their release date. SA8. The County's challenge to these separate

provisions is waived and, in any event, lacks merit.

Most importantly, this claim was waived. "Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 261 (3d Cir. 2009) ; *Laurel Gardens, LLC v. McKenna*, 948 F.3d 105, 114-15 (3d Cir. 2020); *Bell Atl.-Pa. v. Pa. Pub. Util. Comm'n*, 273 F.3d 337, 344 n.3 (3d Cir. 2001). This is a high bar to meet: "[f]or an issue to be preserved, a party must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits." *Ins. Brokerage Antitrust Litig.*, 579 F.3d at 261. These waiver rules protect parties from unfair surprise, promote the finality of judgments, conserve judicial resources, *see Webb v. Philadelphia*, 562 F.3d 256, 263 (3d Cir. 2009), and protect district courts from being "reversed on grounds that were never urged or argued" to them. *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 680 (3d Cir. 1980); *see also Continental Cas. Co. v. Dominick D'Andrea*, 150 F.3d 245, 252 (3d Cir. 1998) (disapproving of "sandbag[ging] the district court" by presenting a new issue on appeal). In this case, Cape May County did not challenge these sections below, whether in its Complaint (*see* SA14-26), motion for preliminary injunction, or opposition to dismissal. (Ocean County and the United States likewise did not mention them in this action.) That is

why the District Court did not discuss whether these sections were preempted, and why this claim on appeal is a quintessential form of "sandbagging."[11]

In any event, the claims lack merit. For one, no express preemption argument applies: Section 1373, which addresses state and local laws on information-sharing with federal authorities, is silent regarding law enforcement's communications with their own detainees. For another, the County does not explain how Sections II.B.4 and VI.A are impliedly preempted: the remainder of the INA "impose[s] obligations solely on the federal government," JA73, and says nothing regarding the process for state and local officials informing their detainees of their rights.[12] To the contrary, ICE's detainers confirm that an affected "alien must be served with a copy of this form for the detainer to take effect." DHS, *Immigration Detainer – Notice of Action*, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf (last

---

[11] In a separate lawsuit, the United States did subsequently challenge Section VI.A. In rejecting that claim, the District Court noted that it had not previously addressed that part of the Directive. *Compare United States v. New Jersey*, No. 20-1364, 2021 WL 252270, *6 (D.N.J. Jan. 26, 2021) (rejecting challenge to Section II.B.5 since the Court had "addressed this exact argument in *County of Ocean*"), *with id.* at *8-9 (addressing claims against Section VI.A for first time). Moreover, that challenge was different in kind from the one Cape May County presents—targeting only a subset of applications of Section VI.A, and not challenging Section II.B.4 at all.

[12] The challenge to Section II.B.4 is a perfect example. Cape May does not explain how a requirement that state and local officers ensure their own detainees understand immigration interviews are voluntary obstructs immigration law any more than a *Miranda* warning obstructs criminal law. If federal authorities depend on interviews done without knowing consent, the problems would run deeper than preemption.

accessed Feb. 8, 2021). Finally, a contrary holding that Sections II.B.4 and/or VI.A are preempted would again introduce an anticommandeering problem by requiring officers to make inmates available for interviews or to hold them beyond their release dates while hiding from detainees their reasons for doing so.

## CONCLUSION

The District Court's dismissal of Appellants' complaints should be affirmed.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:    /s/ Daniel M. Vannella
       Daniel M. Vannella (NJ ID# 015922007)
       Assistant Attorney General

Dated: February 8, 2021

**CERTIFICATION OF BAR MEMBERSHIP**

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Daniel M. Vannella
Daniel M. Vannella
Assistant Attorney General
N.J. Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 116
Trenton, New Jersey 08625-0080
Phone: 609-376-2776

Dated: February 8, 2021

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and L.A.R. 31.1(c), the undersigned hereby certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and other electronic filing requirements:

1.   This brief is 12,483 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

2.   This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type, which complies with Fed. R. App. P. 32 (a)(5) and (6).

3.   The text of the brief filed with the Court by electronic filing is identical to the text of the paper copies being filed with the Court.

4.   Prior to being electronically filed with the Court today, this electronic brief was scanned by the following virus detection software and found to be free from computer viruses:

    Company: McAfee, Inc.

    Product: McAfee VirusScan Enterprise + AntiSpyware

    Enterprise, version 8.8

    /s/ Daniel M. Vannella
    Daniel M. Vannella
    Assistant Attorney General

Dated: February 8, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Daniel M. Vannella
Daniel M. Vannella
Assistant Attorney General

Dated: February 8, 2021